## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**LIFEBIO, INC,**

      **Plaintiff,**

                             **Case No. 2:21-cv-722**

    **v.**                       **Judge Edmund A. Sargus, Jr.**

                             **Magistrate Judge Chelsey M. Vascura**

**EVA GARLAND CONSULTING, LLC,**

      **Defendants.**

### OPINION AND ORDER

This matter arises on Defendant's Motion for Summary Judgment.  (ECF No. 63).  Also addressed in this order is Plaintiff's simultaneously filed Motion for Partial Summary Judgment.  (ECF No. 67).  For the reasons stated below Defendant's Motion is **GRANTED**.  Plaintiff's Motion is **DENIED**.

### I.      Procedural Background

On January 12, 2021, Plaintiff LifeBio Inc. ("LifeBio") filed an action against Defendant Eva Garland Consulting in the Court of Common Pleas of Union County, Ohio.  (ECF No. 1, at 1). On February 19, 2021 Defendant removed this action to the United States District Court for the Southern District of Ohio, Eastern Division.  On January 19, 2023, Plaintiff and Defendant each filed their own respective motions for summary judgment.  (ECF Nos. 63, 67).  Each party responded to their opposition's motion on February 9, 2023.  (ECF Nos. 81, 82).  Finally, they filed their replies on February 23, 2023.  (ECF Nos. 86, 87).

## II.     Factual Background

LifeBio, Inc. is a healthtech/agetech company focused on capturing life stories and assisting people wishing to publish biographies.  (ECF No. 64, at 1).  In July of 2019, LifeBio contacted Eva Garland Consulting, LLC for assistance in securing a National Institute of Health ("NIH") Small Business Innovation Research ("SBIR") grant.  (ECF No. 3, at 2).  LifeBio reached out for assistance because the company was experiencing deep financial need and had no experience in procuring grant funding.  (ECF No. 67, at 2); (ECF No. 97, Exhibit 1, at 2–3).  Eva Garland Consulting ("EGC") is a technology and science focused consulting firm that uses "its expertise to help clients identify and secure critical resources and funding that enable research and product development."  (ECF No. 64, at 1).  It claims to do so by "developing customized strategies to incorporate grant funding in their overall product development plans; drafting and submitting competitive grant proposals in response to requests for proposals from all major government agencies and private foundations; providing comprehensive grant accounting services; and establishing grant accounting systems compliant with federal regulations."  (*Id*., at 1–2).

LifeBio co-founder Beth Sanders set up a call with EGC's business development and sales manager, Penni Robbins-Boone, about the grant funding in mid-July.  (ECF No. 72, at 2); (ECF No. 97, Exhibit 1, at 3) (ECF No. 79, Exhibit 4, at 6).  Robbins-Boone had been an EGC employee for nearly a year at the time of their initial call and had additional prior sales experience.  (ECF No. 71, Exhibit 22, at 531).  She did not, however, receive any specific training in the field of grant proposals.  (ECF No. 97, Exhibit 1, at 3).  Beth Sanders reports that Robbins-Boone steered her toward a "Fast-Track" proposal during their call.  (*Id*.).  She also states that Robbins-Boone assured her that, if LifeBio signed up quickly, EGC could submit their grant proposal by September 5, 2019.  (*Id*.).

2

Within just a few days of their initial meeting, the parties entered into an agreement.  Under the contract terms, EGC was to provide a plethora of services directed at securing grant funding for LifeBio.  (ECF No. 71, Exhibit 6, at 1–3).  The parties agreed to submit the "Fast-Track" funding proposal by the September 5, 2019, submission deadline.  (*Id*., at 2).  In return, LifeBio agreed to pay EGC $9,000 upfront, in addition to a success fee equal to 7% of the total funds awarded payable upon proposal submission.  (*Id*.).  EGC gave LifeBio the option of paying another $9,000 in lieu of the success fee, but LifeBio declined.  (ECF No. 71, Exhibit 1, at 7).  The success fee represented a risk for EGC, as the parties did not yet know if LifeBio's proposal would be accepted by NIH.  And, even if NIH did decide to award LifeBio a grant, the parties could not predict its size, as the NIH has complete discretion over the award of grants.  (*Id*., at 29).

In addition to EGC, LifeBio also contracted with the Benjamin Rose Institute on Aging ("BRIA").  (ECF No. 67, at 10).  LifeBio planned to partner with BRIA in order to expand the scope of its proposal.  With the help of BRIA's expertise, it sought to include a clinical trial and additional human subjects research in its proposal.  (ECF No. 71, Exhibit 1, at 5); (ECF No. 67, at 10).  To do so, LifeBio required BRIA to provide information and materials that would then be used to support its proposal.  (ECF No. 67, at 10); (ECF No. 71, Exhibit 11, at 365–66).

Once the contract between EGC and LifeBio was signed, EGC assigned Dr. Cattani to the matter, as lead Scientific Consultant.  (ECF No. 71, Exhibit 8, at 288).  Her responsibility was to help develop and shepherd LifeBio's proposal through the NIH's grant approval process.  (*Id*.) At the time she started working on LifeBio's proposal, Dr. Cattani had experience working on at least fifty previous proposals for various other clients.  (*Id*., at 319).  However, within a week of beginning work on LifeBio's proposal, Dr. Cattani noticed that the original September 5 deadline

was infeasible.  (*Id.*, at 290).  The parties dispute why.  EGC blames this infeasibility on LifeBio and their partnership with BRIA.  EGC states that "LifeBio did not recognize the scope and depth of information needed from BRIA." (ECF No. 64, at 4).  EGC's employee, Dr. Cattani, concurs.  (ECF No. 71, Exhibit 8, at 291–92).  LifeBio, however, blames EGC's poor initial assessment of the proposal.  EGC, LifeBio contends, "had sold LifeBio on a commitment that EGC could not meet." (ECF No. 67, at 6).  In any event, the parties did not finish their proposal in time for the September submission date and decided to target the next available submission date, January 2020 date.  (ECF No. 71, Exhibit 8, 290); (ECF No. 97, Exhibit 1, at 5).  Plaintiff states that EGC insisted upon this change.  (ECF No. 97, Exhibit 1, at 5); (ECF No. 67, at 5).  Neither party has submitted any written modifications into evidence, and Plaintiff denies its existence. (ECF No. 82, at 5).

In addition to pushing back the submission date, the parties made one other early, unwritten, modification to the contract.  While their original contract stated that EGC was to help LifeBio submit a "Fast-Track" proposal, they actually submitted a Direct-to-Phase II proposal.  (ECF No. 67, at 18); (ECF No. 71, Exhibit 1, at 26).  Neither party offered evidence indicating the substation of a Direct-to-Phase-II proposal resulted in more work or a smaller grant.

The parties debate whether Plaintiff consented to this modification.  However, email communications show that Plaintiff quickly became aware of the modification, and there is no evidence before the Court that Plaintiff voiced objection to the change at the time.  (ECF No. 71, Exhibit 1, at 10).  It is also undisputed that there was no written modification.  In any event, despite agreeing to craft a Fast-Track proposal together on July 15, by July 23 the parties were pursuing a Direct-to-Phase II proposal.  (ECF No. 72, Exhibit 1, at 12).

In the weeks and months that followed, Plaintiff's employees took a second look at their signed contract. When doing so, they noticed that the 7% fee Plaintiff agreed to pay Defendant would subsume all of Plaintiff's expected profit from the grant. Plaintiff alleges that Defendant "never disclosed" "[h]ow the 7% success fee would be paid." (ECF No. 67, at 4). Further, Plaintiff states "EGC's pitch deck references 'free money,' and there was no disclosure or explanation that the success fee would be paid from funds separate from the grant money." (*Id*.). This was distressing to Sanders, as LifeBio's financials were in a "precarious" state. (ECF No. 67, at 4).

On September 13, 2019, Sanders emailed Molly Stanton, EGC's Client Relations Manager, about their fee arrangement. Sanders asked two questions, the one relevant here is as follows: "Since our submission has been delayed to January—are we able to just pay the other $9,000 up front instead of the 7% fee later." (ECF No. 3, Exhibit 2). Stanton replied a few days later, stating "Yes, we can update the payment terms so that you pay an additional $9,000 fee instead of the success fee model. I will prepare an amendment to our current agreement, and I will send for your review." (*Id*.). EGC emailed the amendment to LifeBio several times. However, LifeBio never signed the document. (ECF No. 71, Exhibit 1, at 15). LifeBio never paid EGC the $9,000. (*Id*.); (ECF No. 64, at 6); (ECF No. 87, at 4).

LifeBio, EGC, and BRIA collaborated on crafting the Direct-to-Phase II proposal. However, LifeBio accuses EGC of doing poor work, and not a lot of it. One mistake, LifeBio alleges, cost the company a potential $50,000 in Technical and Business Assistance funds. The exact distribution of work is disputed. Beth Sanders, LifeBio project engineer Becky Williams, and LifeBio Chief Technology Officer Jeff Sanders all report that EGC did not perform the work as expected. EGC contests this and has produced time sheets to Plaintiff showing its employees

worked roughly 180 hours on LifeBio's proposal.  (ECF No. 82, at 6).  It has also produced an email communication from LifeBio co-founder Sanders, thanking EGC for its good work.  (ECF No.71, Exhibit 1, at 26)

Whoever did the work, the proposal was submitted on January 2, 2022, before the NIH's deadline.  (*Id*., at 23).  The NIH considered it for some months before awarding LifeBio funding for its proposal on July 31, 2020.  (*Id*., at 25).  The NIH granted LifeBio two years of funding, $1,384,248 for the first year and $1,107,603 for the second year.   (*Id*., at 25–26).  Totaling over $2.49 million dollars, the grant was close to the maximum potential award amount of $2.5 million.  (*Id*.).  LifeBio reports using this grant to save and expand its business.  (ECF No. 67, at 2).  Upon receiving the grant, LifeBio did not send EGC any additional payment.  (ECF No. 71, Exhibit 1, at 21).

On September 10, 2020 EGC sent LifeBio an invoice for the work it had done on LifeBio's proposal.  (*Id*., at 26).  The invoice totaled $96,897.36, reflecting 7% of the first year NIH grant.  (*Id*., Exhibit 2, at 112–13).  Beth Sanders expressed shock at receiving this invoice and LifeBio refused to pay.  (*Id*., Exhibit 1, at 18).  The next year, on May 28, 2021, EGC sent LifeBio an invoice for $77,532.21, reflecting 7% of the second year NIH grant.  (*Id*., at 27); (ECF No. 64, at 9).  LifeBio refused to pay the second invoice as well.  The parties could not come to a solution as to the payment.  Their dispute culminated on January 12, 2021, when LifeBio Inc. brought suit in the Court of Common Pleas of Union County, Ohio.  (ECF No. 1, Exhibit 1).

### III.     Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or

implausible inferences to be insufficient to survive summary judgment).  It is with this standard in mind that the instant motions will be decided.

The moving party bears the burden of production first.  "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably find for it. *See Anderson Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

## IV.     Analysis

Plaintiff brought three claims against Defendant, claims for declaratory judgment, breach of contract, and breach of good faith and fair dealing.  Plaintiff's declaratory judgment claim sought a judgment declaring that Plaintiff did not owe the 7% success fee Defendant claimed it did. Defendant responded by filing two counterclaims, for declaratory judgment and breach of contract.  Defendant's declaratory judgement counterclaim sought a judgment declaring that Plaintiff *did* owe the 7% fee.  Defendant now contends that it is entitled to summary judgment on all of Plaintiff's claims, as well as on its counterclaims.  (ECF No. 64, at 1).  Plaintiff, to the contrary, argues that it is entitled to summary judgment on all claims.  (ECF No. 67, at 2).  The Court will analyze the claims below.

### a. Declaratory Judgment – Modification

The parties have both moved for summary judgment on the declaratory judgment claim/counterclaim.  The Declaratory Judgment Act, 28 U.S.C.S. § 2201, gives federal courts the

jurisdiction and discretion to declare the rights of litigants under certain conditions. Courts have jurisdiction when there is "an actual controversy, the resolution of which will confer certain rights or status upon the litigants." *Corron v. Corron*, 40 Ohio St.3d 75, 79, 531 N.E.2d 708 (1988). However, the act is unique in that it gives courts "substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co*., 515 U.S. 277, 286 (1995). This discretion is such that "although the District Court has jurisdiction of the suit under the Federal Declaratory Judgments Act, it is under no compulsion to exercise that discretion." *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942). "In this circuit, a district court's discretion is not unfettered, however." *U.S. Fire Ins. Co. v. Albex Aluminum, Inc*., 161 F. Appx 562, 563 (6th Cir. 2006). Courts weigh five factors before exercising their discretion. These factors are as follow:

> (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective.
>
> *Id.*, at 564 (quoting *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.,* 746 F.2d 323 (6th

Cir. 1984)

The Court finds that these factors weigh in favor of exercising jurisdiction. A judgment in favor of either party would settle this controversy. It would clarify the contractual relationship between them, as the parties would finally have certainty as to the value Defendant's fee. The Court sees little risk that the remedy would be used for mere procedural fencing, as both parties have asked for it. There is no danger of friction between federal and states courts, as this case has been removed from state court and constitutes a simple contractual dispute. And finally, the

9

Court can envision no alternative remedy that would solve the parties' conflict.  As such, the Court will exercise its discretion.

Defendant contends that it is entitled to summary judgment in its favor on the declaratory judgment claim/counterclaim because "the parties did not amend the payment terms of the Agreement."  (ECF No. 64, at 14).  It argues that the September 2019 email exchange between the parties did not modify their agreement.  (ECF No. 64, at 11).  It states that "[a]t most, Ms. Sanders' email constituted an invitation for an offer, and Ms. Stanton's response constituted an offer, which LifeBio never accepted."  (*Id.*, at 12).  Plaintiff, on the other hand, asserts that the exchange did modify the agreement.  (ECF No. 67, at 14).  As mentioned above, LifeBio's employee Sanders asked two questions in this exchange, the one relevant here is as follows: "Since our submission has been delayed to January—are we able to just pay the other $9,000 up front instead of the 7% fee later."  (ECF No. 3, Exhibit 2).  A few days later EGC's employee Stanton replied, stating "[y]es, we can update the payment terms so that you pay an additional $9,000 fee instead of the success fee model. I will prepare an amendment to our current agreement, and I will send for your review."  (*Id.*).

Here, there is no dispute as to consideration or whether the parties' employees had authority to bind their respective principals.  The question before this Court is simply whether the parties' email exchange constituted an offer and acceptance sufficient to form an additional contract or an amendment to the original contract.  Specifically, whether Sanders' email constituted an offer, or a price quotation.  And if Sanders' email was indeed an offer, whether it was accepted.  The Court finds that Sanders' email was not offer, that no offer was accepted, and that the parties did not form a contract.

> In order to prove the existence of a contract, a plaintiff is required to demonstrate the essential requirements of an offer, acceptance, and consideration. See *Helle v. Landmark, Inc.,* 15 Ohio App. 3d 1, 8, 472 N.E.2d 765, 773 (1984). A valid and binding contract comes into existence when an offer is accepted. *See Realty Dev., Inc. v. Kosydar*, 67 Ohio Op. 2d 67, 322 N.E.2d 328, 332 (Ohio Ct. App. 1974)(per curiam).

*Dyno Constr. Co. v. McWane, Inc*., 198 F.3d 567, 572 (6th Cir.1999)

A communication is an offer when it is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Reedy v. Cincinnati Bengals, Inc.,* 143 Ohio App.3d 516, 521, 758 N.E.2d 678 (1st Dist. 2001). "To be binding in law, an agreement must be definite and certain. An offer must be so definite in its terms, or must require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." *Gen. Motors Corp. v. Keener Motors, Inc.,* 194 F.2d 669, 676 (6th Cir 1952). "Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *Dyno Constr. Co. v. McWane, Inc*., 198 F.3d 567, 572 (6th Cir.1999). "However, a price quotation may suffice for an offer if it is sufficiently detailed and it 'reasonably appears from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.'" *Id.* (quoting *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc., of Illinois*, 635 F. Supp. 1281, 1284 (N.D. Ill. 1986)).

Here, Sanders' email to EGC contained all material terms, as the only element of the contract LifeBio sought to modify was the payment provision. As such, her email was sufficiently detailed. However, it does not appear from her communication that a simple signal of assent would be all that's necessary to ripen her offer into a contract. As Defendant's asserts, "Ms. Sanders was merely asking a question and inquiring whether EGC would be receptive to a modification of the payment terms." (ECF No. 64, at 13). Plaintiff asked, "are we able to,"

11

change the payment terms (ECF No. 3, Exhibit 2).  The Court does not read that language as a "manifestation of willingness to enter into a bargain," rather as an invitation for an offer. *Reedy v. Cincinnati Bengals, Inc.,* 143 Ohio App.3d 516, 521, 758 N.E.2d 678 (1st Dist. 2001). Plaintiff was making a factual inquiry.  Defendant could not accept this supposed "offer" with a simple signal of assent.

Further, Stanton did not, in fact, signal assent in her reply.  The Court concurs with Defendant's assertion that Stanton's response indicates "that she construed Ms. Sanders's email as a preliminary negotiation rather than an offer."  (ECF No. 64, at 13).  Her reply that "[y]es, we can update the payment terms," implies that she believed there to be work to be done.  Her actions reflect this view.  Stanton proceeded to update the payment terms and sent them back to Sanders for LifeBio's acceptance.  LifeBio never did accept.  (ECF No. 67, at 7).

LifeBio argues that Sanders "had no reason to believe the amendment documents were anything more than a mere memorialization of the change in terms that had been previously agreed to."  (ECF No. 67, at 7).  It takes issue with Stanton "asking if [Sanders] had received the amendment 'for your review,'" rather than specifically telling her that she was required to sign it. (*Id*.).  However, this argument is irrelevant.  The question is whether the parties modified their existing contract.  The answer to that is no.  Any apparent misunderstanding merely reinforces the conclusion that the parties never modified their contract.  The Court **DENIES** Plaintiff's Declaratory Judgment request and **GRANTS** Defendant's request.

### b.  Breach of Contract

The parties have both moved for summary judgment on the breach of contract claim/counterclaim.  "To establish a breach of contract claim in Ohio, a plaintiff must prove, by

12

a preponderance of the evidence, 'the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff.'" *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) (citing *Jarupan v. Hanna*, 173 Ohio App. 3d 284, 2007 Ohio 5081, 878 N.E.2d 66 (Ohio Ct. App. 2007)). "The interpretation of written contract terms is a matter of law for initial determination by the trial court." *Anadarko E & P Co. LP v. Northwood Energy Corp.*, 970 F. Supp. 2d 764, 769 (S.D. Ohio 2013). "The role of courts in examining contracts is to ascertain the intent of the parties." *Id.*, citing *Savedoff*, 524 F.3d at 762. That includes "the determination of whether [the contract] terms are ambiguous." *Savedoff*, 524 F.3d at 762.

Before establishing a breach of contract, it is necessary to establish the contract's existence.

> "The Supreme Court of Ohio has determined that, 'the law is clear that to constitute a valid contract, there must be a meeting of the minds of the parties, and there must be an offer on the one side and an acceptance on the other.' *Noroski v. Fallet*, 2 Ohio St.3d 77, 79, 2 Ohio B. 632, 442 N.E.2d 1302 (1982). An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' *Leaseway Distribution Centers, Inc. v. Department of Administrative Services*, 49 Ohio App.3d 99, 105, 550 N.E.2d 955 (1988) (quoting Restatement (Second) of Contracts § 24 (1981)). The Sixth Circuit, applying Ohio law, has stated that 'in order to prove the existence of a contract, a [party] is required to demonstrate the essential requirements of an offer, acceptance, and consideration. A valid and binding contract comes into existence when an offer is accepted.' *Dyno Construction Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (internal citations omitted).

*Goodyear Tire & Rubber Co. v. S-TEC Corp.*, No. 5:01CV02470, 2004 U.S. Dist. LEXIS 27758 (N.D. Ohio Aug. 25, 2004).

Here, the parties disagree as to who breached the agreement and how. Defendant, denying that any modification to the contract occurred, argues that Plaintiff breached their

contract by not paying Defendant.  (ECF No. 64, at 8–9).  Plaintiff, however, contends that

Defendant breached through a failure to perform.  (ECF No. 67, at 15–19).  As mentioned in the

previous section, the Court finds the parties did not modify the contract.  As such, both

Plaintiff's non-performance-based breach claim and Defendant's non-payment breach claim

remain.

Courts do not order recovery in breach of contract cases where the breach was minor.   In

order to recover for such a claim under a theory of non-performance, the plaintiff must prove that

the defendant did not perform "substantially."  "The long and uniformly settled rule as to

contracts requires only a substantial performance in order to recover upon such contract. Merely

nominal, trifling, or technical departures are not sufficient to breach the contract." *Klaus v. Hilb,*

*Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 730 (S.D. Ohio 2006) (citing *Ohio*

*Farmers Ins. Co. v. Cochran*, 104 Ohio St. 427, 135 N.E. 537, Syll., P2 (Ohio 1922))

Here, the parties contract states that Defendant would undertake the following roles:

"provide consulting services related to the preliminary research section of the proposal based on

data generated by LifeBio oversee drafting of the research plan with assistance from LifeBio

personnel; write the commercialization plan; prepare all supplemental documents (facilities,

biosketches, abstract, project narrative, letters of support, etc.); prepare the Company's budget

and budget justification; advise on strategies to maximize budget; coordinate subcontracts and

obtain quotations; prepare human welfare sections as needed with input from subawardees and

subcontractors; contact the program officer as necessary to address any questions; prepare and

assemble the entire proposal; and submit the proposal via Grants.gov and address any error

messages that resulted during the submission process."  (ECF No. 64, at 6) (Citing ECF No. 71,

Exhibit 6, at 248–49)

Plaintiff has presented evidence showing that Defendant breached their contract by not performing as required. It points to a huge number of failures and oversights on Defendant's part. Plaintiff's employee Jeff Sanders provided a breakdown of the work that he states was done, and who completed it. It shows LifeBio and BRIA performing many tasks EGC was hired to perform. The breakdown is as follows:

- Preliminary Research Section: EGC was to write the preliminary research Section, based on data generated by LifeBio. LifeBio and BRIA wrote all of this. LifeBio's closest contact at BRIA, Silvia Orsulic-Jeras, stated in her deposition that she had written two of these sections. LifeBio staff completed the remaining sections. EGC did not provide any substantial input into this part of the grant proposal. See Exhibit C-2, Dr. Cattani's 11/6/19 email assigning tasks.
- Drafting of Research Plan: Ms. Orsulic-Jeras wrote a majority of this and testified that she wrote two of the sections completely. LifeBio also provided substantial input. EGC did not provide any substantial input into this part of the grant proposal. See Exhibit C-3, Dr. Cattani's 12/24/19 email assigning tasks.
- Write Commercialization Plan: The Commercialization Plan was primarily written by Ms. Sanders, with input from other LifeBio staff and Ms. Orsulic-Jeras As evidenced by the documents, emails assigning this work to Ms. Sanders, and the notes, it is clear that LifeBio, mainly Ms. Sanders, had written the commercialization plan. In the evidence, it is seen that EGC/Dr. Cattani had asked Ms. Sanders to write certain items and clarify items. The contract specifically states that EGC would write the commercialization plan. EGC did not provide any substantial input into this part of the contract. See Exhibit C-2 and Exhibits C-3 and C-4, draft commercialization plans written by LifeBio
- Supplemental documents: EGC did not prepare or obtain any of this information or documents; these were completely done by LifeBio and BRIA. LifeBio and BRIA wrote all of their own biosketches, BRIA and LifeBio obtained all the letters of support. LifeBio prepared and obtained all facilities information. See Exhibit C-2 and Exhibit C-6, email commending Ms. Orsulic-Jeras (BRIA)'s "heroic efforts"
- Budget and budget justification: There are two key points here. The first is that this was missing a significant budget item (according to EGC) that EGC expected LifeBio to draw down and pay EGC's invoice from these government grant funds. The second is that no budget strategies were ever discussed. Budgeting was not explained in a manner that was legally and federally allowed, which resulted in LifeBio missing benefits for staff that was working on this grant. See Exhibit C-7,
- NIH Phase II Budget. As seen in Exhibit C-7, there is no budgeting for fringe benefits, such as items for payroll taxes, vacation, holiday pay, and similar types of items that would be standard for each employee. LifeBio was not aware of,

15

nor was it informed, that these items were required to broken out separately, essentially splitting a salary/hourly wage people into two distinct budget items: one being the actual salary/wage and the other being the fringe benefits. It was only after the award that LifeBio realized that it could not obtain funding for these items.

- Maximize budget: The contract specifies that there would be budget comparisons, yet multiple budgets for comparisons were never done. As previously mentioned, EGC also incorrectly calculated and failed to inform LifeBio how indirect costs are calculated. LifeBio learned after the award was funded that the indirect cost base does not include any subaward in the calculation, even though it was presented as though it did. This left another large hole in indirect costs that were incorrectly budgeted, amounting in another shortage of ~$25,000. LifeBio also learned, after being informed by the grant officials, that its TABA submission was not allowed and not properly submitted. All of the items listed in TABA are not allowable, and the TABA submission was incorrectly budgeted. LifeBio further learned from Dr. Cattani that EGC did not know how to prepare or submit TABA because TABA was a "gray area" that has "shifted over the years". Depo. Cattani 80:16-24 and 84:10-21. Dr. Cattani is essentially explaining how TABA was budgeted incorrectly. This left another $50,000 shortage in the total funding. See Exhibit C-7.

- Coordinate subcontracts and obtain quotations: All quotes, subcontracts and pricing items related to the grant proposal were obtained by LifeBio, mostly by Mr. Sanders. There were no quotes obtained by EGC. See Exhibit C-8, Dr. Cattani's 10/17/19 email asking LifeBio to obtain quotes and two example quotes.

- Human welfare sections: The following is a list of documents that were needed that were missed (see Exhibit C-9, grant submission):

o All human subject training certifications
o Missed data and safety monitoring plan
o Allegations of research misconduct policy
o FCOI - financial conflict of interest
o Missed having safety officer
o TABA supporting documentation
o Missing a correct power analysis
o Missed key personnel
o Missed everything that was asked for in JIT (See Exhibit C-10, JIT emails)
o All of these missed items were later required by grant funding agency before being able to continue and complete the work. This also caused excessive, unexpected work on the LifeBio side to order to obtain this information while we were in the middle of year 1 of the grant.

- Contact with Program Officer: EGC actually asked LifeBio to follow up with the program officer and then attempted to sell us additional services to pay for this part of the contract. LifeBio was given the impression that this was part of the services provided, and there were no conditions on this particular bullet point that would state it would not be included after a proposal was submitted. In an email from 4/3/2020, EGC/Dr. Cattani unilaterally decided that this was

16

not a valid part of the contract and for all intents and purposes, refused to perform this part of the contract. Instead, they told LifeBio to reach out to the program officer and attempted to sell additional services to perform this line of the contract. See Exhibit C-10 and Exhibit C-11, email from Dr. Cattani declining to respond to the Program Officer.

- Project Summary and Project Narrative: These sections were primarily written by LifeBio team, including BRIA.
- References: LifeBio and team prepared and assembled most if not all of the research references.
- Biographical Sketches: LifeBio and BRIA wrote all of their own biosketches. See Exhibit C-2.

(ECF No. 67, at 16–18).

Additionally, LifeBio accuses EGC of unilaterally changing the type of application LifeBio was to submit. (*Id.*, at 18).

Defendant has presented admissible evidence to the contrary[1]. EGC has pointed the Court to evidence showing a genuine dispute of material fact as to the who initiated the change in application type (ECF No. 72, Exhibit 1, at 12); (ECF No. 81, Exhibit 2, at 2), to evidence indicating that LifeBio received near the maximum grant award available (ECF No. 71, Exhibit 1, at 13–14), that LifeBio did not miss out of additional TABA funds (*Id.*, Exhibit 8, at 304), and that EGC was not at fault for the delay in proposal submission (*Id.*, Exhibit 8, at 291) (*Id.*, Exhibit 10, at 336–337). Further, Defendant's timesheets, witness affidavit, and an email exchange create a genuine issue of fact as to the amount of work that EGC did for LifeBio's proposal and whether it was consistent with their contractual obligations. (ECF No. 82, at 6); (ECF No. 71, Exhibit 8); (ECF No. 86, at 4); (ECF No.71, Exhibit 1, at 26). The Court cannot

---

[1] Defendant also argues that "Plaintiff Should Be Estopped From Claiming that EGC Breached the Agreement Because It Continued Performance and Benefited From EGC's Services." (ECF No. 64, at 21). However, as Defendant has carried its burden in showing a genuine dispute of material fact as to breach, the Court need not reach this particular argument.

17

weigh the strength of the parties' evidence. As such, summary judgment is **DENIED** as to

Plaintiff's breach of contract claim

On the other hand, the Court grants summary judgment as to Defendant's breach of contract

claim. As mentioned in the previous section, the Court awarded declaratory judgment to

Defendant. Further, it is undisputed that Plaintiff has not paid Defendant pursuant to its contract.

Plaintiff has breached their contract by failing to pay what it agreed. However, Plaintiff argues

in the alternative that its non-performance is excusable. (ECF No. 82, at 11).

Plaintiff argues that, even if the Court finds no contract modification, it should still deny

Defendant the success fee as the fee is "unconscionable." (ECF No. 82, at 11). It is well

established that "[u]nconscionability of a contract is an affirmative defense to a claim brought on

a contract." *Deutsche Bank Natl. Trust Co. v. Pevarski*, 187 Ohio App.3d 455, 2010-Ohio-785,

932 N.E.2d 887, ¶ 29 (4th Dist.) (citing *St. Vincent Charity Hosp. v. Eget* (Mar. 26, 1987),

Cuyahoga App. No. 52242, 1987 Ohio App. LEXIS 6811). "Absent unconscionability, Ohio

courts have held the concept of freedom of contract to be fundamental to our society." *Id*., (citing

*Dorsey v. Contemporary Obstetrics & Gynecology, Inc*. (1996), 113 Ohio App.3d 75, 80, 680

N.E.2d 240). As

> the determination of whether a contract is unconscionable is a question of law for
> the court, a factual inquiry into the particular circumstances of the transaction in
> question is required. Generally, contracts or clauses thereof are 'unconscionable'
> where one party has been misled as to the 'basis of the bargain' where a severe
> imbalance in bargaining power exists, or where specific contractual terms are
> outrageous. The unconscionability doctrine consists of two prongs:
> '(1)substantive unconscionability, i.e., unfair and unreasonable contract terms,
> and (2) procedural unconscionability, i.e., individualized circumstances
> surrounding parties to a contract such that no voluntary meeting of the minds was
> possible. 'These two concepts create what is, in essence, a two-prong test of
> unconscionability. One must allege and prove a 'quantum' of both prongs in order
> to establish that a particular contract is unconscionable.

> "Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability." *Hall*, quoting *Click Camera* at 834. However, "[i]n determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. Corbin suggests the test as being whether the terms are 'so extreme as to appear unconscionable according to the mores and business practices of the time and place.;" *Leach* at P60, quoting *Williams* at 450 (omission in original).

*Id.*

Here, Plaintiff contends that the success fee ECG charged LifeBio was clearly unconscionable, both procedurally and substantively. (ECF No. 67, at 19–20). ECG disagrees, arguing that unconscionability is not a bar to their recovery. The Court concurs with EGC.

As evidence for the procedural prong of the unconscionability test, Plaintiff states that "EGC enticed LifeBio based upon its alleged expertise in applying for and obtaining grant funding. It sold its services without disclosing that its success fee would not be included in the budget or even a range of numbers of what that fee might be." (ECF No. 67, at 19). However, Plaintiff does not support this claim with evidence of record. Plaintiff argues the contract was substantially unfair because "EGC puts the burden on its clients to perform most of the heavily lifting, and the fee is disproportionate to the work EGC performed." (ECF No. 67, 20). Plaintiff's sole citation to the record simply establishes that ECG could make a profit under either the fixed fee or success fee pricing model. (*Id.*); (ECF No. 78, Exhibit 3, at 24. Plaintiff has not carried its burden of establishing its affirmative defense that Defendant's claim is barred by the doctrine of unconscionability.

Defendant, on the other hand, has pointed out that the transaction was procedurally fair. Defendant rightly states "[i]t is undisputed that the parties engaged in an arm's length negotiation for the original Agreement" and "Plaintiff had the choice to pursue the proposal on its own or to hire a different company." (ECF No. 86, at 8). This is not a situation where there exists "individualized circumstances surrounding parties to a contract such that no voluntary meeting of the minds was possible." *Deutsche Bank Natl. Trust Co. v. Pevarski*, 187 Ohio App.3d 455, 2010-Ohio-785, 932 N.E.2d 887, ¶ 29 (4th Dist.). As such, summary judgment is **GRANTED** as to Defendant's breach of contract claim.

### c. Bad Faith

Defendant argues that it is entitled to summary judgment in its favor on Plaintiff's breach of good faith and fair dealing claim because "Ohio Does Not Recognize It As a Separate Claim and Defendant Acted in Good Faith." (ECF No. 64, at 22). Plaintiff does not respond to this argument. Plaintiff has abandoned its claim. Further, Defendant is correct in that Plaintiff's claim is not freestanding. *Frisch v. Nationwide Mut. Ins. Co.*, 553 Fed.Appx. 477, 482 (6th Cir. 2014). Courts in Ohio "recognize the fact that good faith is part of a contract claim and does not stand alone." *Id.* (quoting *Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 108 Ohio App. 3d 637, 671 N.E.2d 578, 584 (Ohio Ct. App. 1996)).

Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's standalone breach of good faith and fair dealing claim.

### V. Conclusion

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. The Court **DENIES** Plaintiff's Motion for Summary Judgment. There remains a genuine issue

of material fact as to whether Defendant breached the parties' agreement through a failure to perform.  This case is to remain open.

**IT IS SO ORDERED.**


<u>**7/14/2023**</u>                                     <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                          **EDMUND A. SARGUS, JR.**
                                                  **UNITED STATES DISTRICT JUDGE**